## MIDDLESEX WATER CO. v. BOARD OF PUBLIC UTILITY COMMISSIONERS OF NEW JERSEY.

(District Court, D. New Jersey. January 7, 1926.)

1. **Public service commissions** ⊙⟹7 — **Present fair value of property of public utility corporation given effect in fixing rate base.**

Present fair value of property belonging to public utility corporation must be given effect in fixing rate base.

2. **Waters and water courses** ⊙⟹203(10)—**Pre-war prices not considered in fixing rate base.**

Fixing rate base of water company, based largely on pre-war prices, *held* error.

3. **Waters and water courses** ⊙⟹203(12)— **Court's determination as to which method of determining depreciation of water company's property was correct held unnecessary.**

Where net value of water company's properties, depreciated, exceeded amount found by master, whether method of determining depreciation used by water company or board of public utility commissioners was used, District Court will not determine which method was correct.

4. **Waters and water courses** ⊙⟹203(10)— **Finding of value of water company's property sustained.**

Evidence *held* to support master's finding as to fair value of properties belonging to water company, useful and used in its business in securing and supplying water.

5. **Public service commissions** ⊙⟹7—**Rates giving less than 6 per cent. return held confiscatory.**

Rates which would give return on valuation of less than 6 per cent. *held* confiscatory.

6. **Waters and water courses** ⊙⟹203(10)— **Water company entitled to reasonable rates.**

Before water company can be held culpable for not having laid larger main, it must be afforded an opportunity through reasonable rates to earn enough, not only to produce fair return on value of its property, useful and used in its business, but enough more to enable it to secure capital necessary to install required main.

In Equity. Suit by the Middlesex Water Company to enjoin as invalid a rate order of the Board of Public Utility Commissioners of New Jersey. Decree for complainant, affirming master's report.

The following is the report of the special master:

"To the Honorable the Judges of the District Court of the United States for the District of New Jersey:

"The report of Aaron V. Dawes, special master appointed in the above cause on September 29, 1924, whereby he was directed to take the testimony of the parties, make all needed computations, and report to the court his conclusions and recommendations, is herewith submitted, with the testimony taken stenographically, which has been transcribed, with the exhibits offered by the parties.

"I wish to make my acknowledgment to counsel for their courtesy and fairness, and efforts to assemble the facts and aid the master in the performance of the duties which devolved upon him.

"The plaintiff is a consolidated corporation of the following companies:

"(a) The Middlesex Water Company was incorporated in 1896 under an act of the Legislature entitled 'An act for the construction, maintenance and operation of waterworks for the purpose of supplying cities, towns and villages of this state with water,' approved April 21, 1876. This company was organized to construct and maintain a water plant in the township of Woodbridge for a period of 50 years.

"(b) The Midland Water Company, organized under an act entitled 'An act concerning corporations,' approved April 7, 1875, and the supplements thereto and the amendments thereof, and consolidated with the Middlesex Water Company in 1897.

"(c) The Consumers' Aqueduct Company, consolidated in 1907 with the plaintiff above mentioned, under the name of plaintiff, Middlesex Water Company.

"The plaintiff operates its plants within the territory or district which embraces the townships of Piscataway, Raritan, and Woodbridge, in the county of Middlesex, and Clark, in the county of Union, and the boroughs of Metuchen and Carteret. This district contains a population of 45,000 inhabitants, increasing rapidly, and some of the largest and most important manufactories in New Jersey are located within its territory.

"The plaintiff has three sources of water supply:

"(1) The so-called South Plainfield station, with pumping station. This yields about 750,000 gallons per day from wells tapping a subterranean supply.

"(2) A reservoir on the Robinson's

branch of the Rahway river, in Clark township, a short distance west of the ·city of Rahway. A dam was there erected impounding 200,000,000 gallons, from which a daily supply of from 4,000,000 to 5,000,000 gallons is obtained. At this station is erected a filter plant, and the main laid from there to Woodbridge, 16 inches in diameter, is connected with the 12-inch main laid from the South Plainfield station. .

. "(3) The Park Avenue station, located just south of Plainfield, contains 16 wells, tapping a source which yields about 5,000,000 gallons daily.

"The mains of the plaintiff, the Plainfield Union Water Company, and the Elizabethtown Water Company are all connected. The president of the Plainfield Union Water Company and of the plaintiff is Frank Bergen, Esq., who is also counsel for the Elizabethtown Water Company.

"Some 15 years ago these three companies, realizing that the growth of the .communities within their respective districts required a larger supply of water than they then. possessed, canvassed the various water supplies, selected an additional source at the junction of the Millstone and Raritan rivers, in Somerset county, and upon the opinion of hydraulic engineers of eminence plans were devised, lands secured, and an estimate that it would cost $5,000,000 to carry out the plans was made. The plans were laid before the board of conservation and development of New Jersey by these companies, and the board approved them.

"The Elizabethtown Water Company, or one of its subsidiary companies, owns the lands at the junction of those rivers, and had expended $1,000,000 thereon, until the costs of developing the plans had increased so greatly that it was impossible for the plaintiff or either of the other water companies to obtain the amount of capital required to continue the development on any financial statement they could make.

"Realizing their limited financial faculties, and the difficulties of obtaining the necessary capital, the companies offered to the several municipalities through which their mains were laid, and in which they were supplying water, to sell their waterworks to them at a price to be agreed upon or fixed by arbitration or condemnation, or sell the distributing systems to the several communities served by them, the companies retaining the water sources, or to enter into a contract with the towns whereby the necessary funds could be obtained to finance the enterprise. · These various projects were not responded to favorably by any of the communities or municipalities interested.

"From 1917 the water facilities of the plaintiff have not been adequate to serve these growing communities, and the manufacturers and the domestic users of water have been seriously hampered. The plaintiff proposed to the board to increase the supply of water to the communities by laying a 24-inch in diameter main from Oak Tree to Carteret, a distance of about 10 miles, at an estimated cost of at least $450,-000, and by installing a compressed air equipment at Park Avenue station, at an estimated cost of $250,000.

"The plaintiff has a floating indebtedness of $175,000, and now needs $100,000 additional capital to extend its distributing system and to meet increased demands for service. The plaintiff has outstanding, at the present time, capital stock and bond obligations as follows:

| | | |
|---|---|---|
| Consumers' Aqueduct Company bonds, assumed by plaintiff......... | $200,000 | |
| Mortgage bonds......... | 700,000 | |
| Floating indebtedness, above mentioned ...... | 175,000 | $1,075,000 |
| Preferred stock, interest 5 per cent. ............. | $250,000 | |
| Common stock .......... | 250,000 | |
| Common stock, issued by approval of defendant.. | 90,000 | 590,000 |
| | | $1,665,000 |

"The plaintiff originally fixed its water rates by taking an average of the prices charged by other water companies in that section of the state. These rates remained from the formation of the company until 1920, when in March of that year the plaintiff filed a new schedule, increasing the rates, which was approved by the board and went into operation. In the fall of the same year another schedule was submitted, owing to the mounting prices of coal, labor, and materials, and the stress of these increased costs was relieved by the defendant to a degree, but not so much as the plaintiff had requested.

"On December 10, 1923, the plaintiff submitted a new schedule of increased rates, liberal enough to secure a fair return on the fair value of its property, used and useful in the public service, on a valuation of $2,-500,000, exclusive of water rights. The

board suspended the rates proposed by the plaintiff and initiated a hearing thereon, which eventuated in the following conclusions:

" '(1) That the value of the property of this company for the purpose of determining rates as of December 31, 1923, including the proposed 24-inch main from Oak Tree to Carteret, is $2,190,200. (Note.—24-inch main cost will be $452,000.)

" '(2) That the fair return for this company to receive on said valuation, subject to the provisions that the service rendered by it shall be safe, adequate, and proper, is $160,000.

" '(3) That the rates filed by the petitioner are unjust and unreasonable, and are disapproved.

" '(4) That the petitioner shall be afforded relief by increased rates.

" '(5) That the service rendered by the petitioner has not been and is not now up to the standard of being reasonable, sufficient, and adequate, and that the value of the existing service is best reflected by deducting 10 per cent. from the schedule of rates hereinafter set forth, which schedule, as indicated, is based upon normal service.

" '(6) That the transmission line from Oak Tree to Carteret is an admitted necessity, and should be in place in order that the present service may be adequate. Its installation should be taken up at once and completed in the shortest possible time; it is on this account that its value is included in the base upon which the new rates are predicated, but until the installation is completed and the line put in service the deduction provided for herein is made in the rates.

" '(7) That the installation of an air lift system, proposed as an improvement to the Park Avenue pumping station, does not appear to the board as the most satisfactory and efficient system for the solution of the problem to be met in obtaining additional water at that point. The board believes that, before any contract is let for the installation of an air lift system, a detailed investigation should be made of other methods of augmenting the water supply from the well field at Park Avenue.'

"The plaintiff promptly, upon the filing of the conclusions of the board, exhibited its bill of complaint in this court, alleging that the rates allowed thereby were in violation of its constitutional rights, and, if enforced, would result in confiscation of its property.

"The Vital Question is One of Value.

"The vital question in this case is whether or not the rates fixed by the board allowed a fair return to the plaintiff upon the value of its property. Mr. Justice McReynolds says, in Pacific Gas Co. v. San Francisco, 265 U. S. 403, 415, 44 S. Ct. 537, 540 (68 L. Ed. 1075), that: 'Our concern is with confiscation. Rate-making is no function of the courts; their duty is to inquire concerning results, and uphold the guaranties which inhibit the taking of private property for public use without just compensation under any guise.'

"The defendant is a public utility board of this state, acting in an administrative capacity to ascertain and allow fair and just rates for the use of public utilities devoted to the public service. The duty of the court in an issue of confiscation is stated by the Supreme Court of the United States in a line of cases as follows:

"Smyth v. Ames, 169 U. S. 466, 527, 18 S. Ct. 418, 426 (42 L. Ed. 819): 'What are the considerations to which weight must be given when we seek to ascertain the compensation that a railroad company is entitled to receive, and a prohibition upon the receiving of which may be fairly deemed a deprivation by legislative decree of property without due process of law? Undoubtedly that question could be more easily determined by a commission composed of persons whose special skill, observation, and experience qualifies them to so handle great problems of transportation as to do justice both to the public and to those whose money has been used to construct and maintain highways for the convenience and benefit of the people. * * * The duty rests upon all courts, federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions and the liberty which is enjoyed under them depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land.'

"Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 397, 14 S. Ct. 1047, 1054 (38 L. Ed. 1014): 'Still there can be no doubt of their [the courts] power and duty to inquire

whether a body of rates prescribed by a Legislature or a Commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and if found so to be to restrain its operation.'

"San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 810 (43 L. Ed. 1154): 'But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as, under all the circumstances, is just both to. the owner and to the public; that is, judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flargrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use. Chicago & Grand Trunk Railway v. Wellman, 143 U. S. 339, 344 [12 S. Ct. 400, 36 L. Ed. 176]; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 399 [14 S. Ct. 1047, 38 L. Ed. 1014]; Smyth v. Ames, above cited. See, also, Henderson Bridge Co. v. Henderson City, 173 U. S. 592, 614, 615 [19 S. Ct. 553, 43 L. Ed. 823].'

"Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 689, 43 S. Ct. 675, 678 (67 L. Ed. 1176): 'Plaintiff in error [utility company] is entitled under the due process clause of the Fourteenth Amendment to the independent judgment of the court as to both law and facts. Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289 [40 S. Ct. 527, 64 L. Ed. 908].'

"Further, in a line of cases in the Supreme Court of the United States are laid down the necessary elements to be considered in carrying out the constitutional mandate to refrain from taking private property for public uses without just compensation: Smyth v. Ames, 171 U. S. 361, 18 S. Ct. 888, 43 L. Ed. 197; Georgia Railway Co. v. R. R. Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Bluefield v. Pub. Serv., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Willcox v. Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

"Darnell v. Edwards, 244 U. S. 564, 569, 37 S. Ct. 701, 703 (61 L. Ed. 1317): 'It is well established that in a question of rate-making there is a strong presumption in favor of the conclusions reached by an * * * administrative body after a full hearing.'

"Ga. Ry. Co. v. Railway Comm., supra: 'Each change of rate was made upon careful consideration. If there was error, it was error in prophecy, or error of judgment in passing upon the evidence. We cannot say that the evidence compelled a conviction that the rate would prove inadequate.'

"Also, it is the duty of a legislative body, the defendant board, and this court (Minnesota Rate Cases, 230 U. S. 352, 455, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18) to recognize that a utility company is entitled to a reasonable share in the general prosperity of the communities which it serves, still it is said the increase so allowed cannot properly extend beyond the normal market value of land in the vicinity having a similar character.

"The Inventories of Mr. Hill and Mr. Shaw and Their Estimates of Value.

"The plaintiff submitted an inventory, prepared by its expert, Nicholas S. Hill, Jr., who is an experienced sanitary and hydraulic engineer of 30 years' practice and experience. He prepared his inventory by going to the field and making an actual examination of the units of the plant, ascertaining the qualities and quantities of the various items in the plant. He segregated and classified the items in accordance with the requirements of the defendant board under approved numbers. Then these units were valued at fair current prices as of that date, upon what he conceived a contractor or manufacturer would have received for installing the structures and equipment of the plaintiff in place, as of September 30, 1924. Mr. Hill estimated that the cost new, undepreciated, of the plant would be (inclusive of lands) $3,330,848, and that the cost new, depreciated, would be (inclusive of lands) $2,975,092.

"The defendant submitted an inventory prepared by Walter A. Shaw, who served four years upon the public utility board of Illinois, and had had practical experience with building of utilities and their equipment. He made sufficient personal inspection of the plaintiff's plant to convince him that the Hill inventory as to the units com-

posing the plant was dependable and accurate. His estimate of the—

Cost of reproduction new as of September 30, 1924, undepreciated, of the assets, *exclusive of lands*, was $2,521,461
And the lands were appraised at.... 133,854

Totaling, with value of land added ...................... $2,655,315
And of reproduction cost new, depreciated ........................ $1,811,765
And lands appraised at............ 133,854

· Totaling .................... $1,945,619

"The historical cost was estimated as follows:

"Hill testified the historical or book value as of December 31, 1923, was $1,663,668, which he appreciated into the dollars of to-day to $2,995,000. Capitalization of the plant he testified was $1,603,031. The same, at pre-war prices, he testified was $1,518,034. Items installed prior to January 1, 1916 on pre-war prices, plus additions, at actual cost, $1,794,834.

"Shaw estimated the same assets at:

Prices of 1914 and 1915, of property in place December 31, 1915...... $ 825,632
Property subsequently added at original cost ..................... 535,532

$1,361,164
Working capital................... 55,000
Land value added................ 133,854

$1,550,018
Depreciated .................... $1,064,944
133,854

$1,198,854

"The board found the value of the plant to be, as of December 31, 1923, $1,689,031 (without new mains, $454,020), to which should be added additions of $60,619—totaling $1,749,650.

"An examination of the valuation placed upon the physical properties, exclusive of lands and intangible, by these experts, show the estimates to be not so far apart. However, embarrassment is keenly felt by the omission of Mr. Shaw to give his estimate of going value, contenting himself as saying he considered it in his estimate. It is difficult for one to see how any element of going value can be given to the separate units of the plant valued separately, and not in their entirety as a going plant.

"Mr. Hill's estimate of the physical properties, exclusive of lands and intangibles, at prices of to-day, was, undepreciated, $2,360,059; and depreciated, $2,055,586. Mr. Shaw's estimate of the same, undepreciated,

was $2,287,329; and depreciated, $1,572,147.

"In weighing the merits of the respective estimates there is no satisfactory or definite evidence that the price of any unit has been exaggerated by either appraiser. The largest item is No. 129, comprising the mains and pipes which constitute 50 per cent. of the plant, and there is a difference between the two estimates on that item of $114,166. The burden of proof is fully recognized to be upon the plaintiff to sustain every proposition upon which it relies to nullify the results of the defendant's conclusions, and this burden of proof must be indulged in the exercise of "the independent judgment" on both law and fact which is emphasized in the Ben Avon and Bluefield Cases.

"Mr. Hill has a greater knowledge of this plant, spread over two or three years. The conclusion reached is that this greater knowledge of this plant, possessed by Mr. Hill, is a dominating circumstance, which entitled his testimony to a greater degree of dependability than Mr. Shaw's.

"Depreciation.

"That allowance for depreciation should be made from the value of the plant is clearly settled by the Supreme Court of the United States. Knoxville v. Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. The physical depreciation should be established by evidence, and estimates of competent experts, based on an examination of the plant, subsequent to the depreciation, are preferable to averages based on assumed probabilities. Pacific Gas Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075.

"Ohio Utilities Co. v. Public Utilities Commission of Ohio, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656, decided at this term by the Supreme Court of the United States, holds that the opinion of experts upon the question of value, uncontradicted, should not be arbitrarily disregarded by utility commissions.

"Two estimates of depreciation have been made, one by Hill, who personally examined the plant, observed the condition of the various parts of it, and then estimated what he thought was a fair allowance for actual and probable depreciation, based upon his observation and his judgment of the probabilities of diminished service due to yearage and other causes. He depreciated the de-

preciable assets of the plaintiff's plant at $304,473.

"The testimony respecting at least one-half of these depreciable assets, to wit, those mentioned in No. 129 in the schedule hereto annexed, established that mains and pipes were as good now as when laid. Shaw bases his estimate on the straight-line method, and thereby assumed what the probabilities of the condition of the units was, and estimated accordingly.

"What is the actual depreciation is one of the problems. The public must pay the bill for depreciation in increased expenses, and increased rates are necessary if the depreciation is excessive, and, if the depreciation is small, the annual allowance therefor is necessarily diminished, but the rate base is increased, so the burden in any view falls ultimately on the ratepayer. The common-sense view would be to accept the testimony of the witness who knows the conditions, rather than that of a theorist who speculates on probabilities.

"The judgment of Mr. Hill is accepted, and in schedule A appears a summary of the depreciable assets at prices new, depreciated, as of September 30, 1924. Schedule B is a summary of the estimates of Mr. Shaw of assets in place at 1915 prices on December 31, 1915, and of subsequent additions at actual cost; also an estimation of prices of reproduction new, undepreciated, and depreciated as of to-day of the depreciable assets.

### "Overheads.

"If the district served by this water company were without this plant, and the inhabitants were about to produce one precisely similar to this concern, expenses would have to be incurred in addition to the actual cost of the various units constituting the plant, and these expenses are known as overheads or incidentals during construction. These overhead charges are specified in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244:

"(1) Time and money expended in the promotion of the enterprise, and legal expenses and cost of incorporation.

"(2) Competent engineers to prepare plans and to superintend the construction.

"(3) Contingencies such as necessarily arise from lack of foresight, and are such as could not have been foreseen with good care, but nevertheless they are inherent in every enterprise, and must be considered in estimating the cost of construction.

"(4) Cost of administration, which includes time and money spent in purchasing material and supervision during construction.

"These costs were estimated by Mr. Shaw and Mr. Hill, respectively, as follows:

| Items. | Per Cent. | |
|---|---|---|
| | Mr. Shaw. | Mr. Hill. |
| Legal and administrative | 1½ | 1½ |
| Engineers and superintendents | 5 | 4 |
| Interest during construction | 3½ | 7 |
| Taxes and insurance | 1 | 1½ |
| Contingencies—errors and omissions | 2 | 3½ |
| | 13 | 17½ |

"The question before us is to ascertain the capital cost factors in duplicating this plant, that they may be given such weight as may be just and fair. It is obvious that the defendant board and Mr. Shaw erred in attempting to ascertain the value of the overhead elements by confining them to the cost appreciated to 1924 prices of this plant in 1915, and the actual cost since then on such overhead expenses as appeared in the reports of the plaintiff to the defendant board. One fault with such an estimate is that it does not give to the plaintiff the cost, in the dollars of to-day, of overheads which necessarily were and would be incurred in erecting a plant such as plaintiff's now is.

"Both Mr. Hill and Mr. Shaw base their percentage of allowances upon their experience and judgment of fair percentages. The testimony of either expert is not superior to the other. The defendant board fixed them at 15 per cent. and a presumption of correctness of the board's action in such a state of the evidence arises, and thereby the overheads should be estimated at 15 per cent. on the depreciable physical assets of plaintiff.

"Interest and legal expenses and taxes should be calculated on the value of lands, $139,854 at 8½ per cent.; but other overheads apply peculiarly to costs entering into the reproduction of the physical property other than land, and should be calculated on the physical properties of plaintiff exclusive of land. Also organization and working capital should be $37,500 and $70,000, respectively.

"Going value must be established by evidence, and cannot be presumed or allowed without evidence. Going value arises from the efficient and successful operation of a plant. It is the value in excess of the value of the parts of a plant. Mr. Justice Pitney, in Denver v. Denver Union Water Co., 246

U. S. 178, 191, 38 S. Ct. 278, 283 (62 L. Ed. 649), spoke thus concerning it: 'With respect to the former item [going value] we adhere to what was said in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165 [35 S. Ct. 811, 815 (59 L. Ed. 1244)]: "That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use." '

"Going value, therefore, is not cost of developing or attaching the business to the property, for, if it were, the greater the cost, the greater would be the going value. New York Telephone Co. v. Prendergast (D. C.) 300 F. 822, 826, describes going value thus: 'It is a mere function or attribute of successful co-ordinated effort. A garment is made out of cloth and silk, buttons, and thread, and by labor; but when completed and well made its value is more than the aggregate cost of the items. It is a going concern, and as such has going value.'

"In Houston v. S. W. Tel. Co., 259 U. S. 318, 325, 42 S. Ct. 486, 489 (66 L. Ed. 961), the Supreme Court further said: 'Whether going concern value should be considered and allowed at all in determining the base for rate making, and, if allowed, what the amount of it should be, depends upon the financial history of the company.'

"The only testimony as to going value was given by Mr. Hill. He testified as follows: 'There are two methods of estimating going value. One is the historic method, of attempting to ascertain what it did actually cost to attach the business of the property up to the time the income of the property was sufficient to pay, not only operating expenses, but taxes, and a proper return; the other is what was known as comparative cost method, in which it was attempted to estimate what it would cost to attach the business, etc.' And he further testified: 'I have based the going value that I have allowed on awards which have been made in a number of other cases, from my knowledge and experience in the cost of developing and consolidating properties of this kind.' And he answered this question: 'Q. In fixing going value, you didn't consider whether there were any profits or losses by this company in the past? A. I say I didn't go into the books.'

"The test by which Mr. Hill measured going value was his knowledge and experience in the cost of developing and consolidating properties of this kind, which is not the test set up in the cases cited, and opinion on those bases is valueless. The question was exhaustively discussed by Judge Haight, and the cases reviewed on page 111 of his report as special master in the Public Service Railway Company's Case on file in this court.

"The defendant board allowed $169,951 as going value on the basis of 10 per cent. of structural costs. The board's findings in rate cases must be sustained, until convincing evidence is adduced showing that the action of the board amounts to confiscation of property. As the board recognized the plaintiff's right to have going value estimated, and did estimate it at $169,951, the presumption that the board acted rightly must supply the lack of evidence and sustain the allowance. My conclusion is that $169,951 shall, on this proceeding, be taken as the going value of plaintiff's plant.

"Water Rights.

"The plaintiff claims that it possesses water rights arising out of its possession of water at the Robinson branch of the Raritan river, and from underground sources at the Park Avenue and South Plainfield stations. The plaintiff estimated the value of these water rights or privileges at $415,000, and claims that the rate base should be augmented by that amount. The lands on which these waters are assembled or derived have been fully appraised on the basis of land value of like character in their respective neighborhoods. The question is, however, has the plaintiff such property in these so-called water rights or privileges as to be part of the rate base?

"The Rights of the State in These Waters.

"Chief Justice Gummere said, in State v. Jersey City, 94 N. J. Law, 431, 111 A. 544, 19 A. L. R. 646:

" 'The control of such waters rests in the state in its sovereign capacity, as representative of, and for the benefit of, the people in common.' The Chief Justice continued: 'The only way in which a municipality can acquire the right to appropriate and use such waters is by a grant directly from the state itself, or by the duly authorized purchase or condemnation of such right from a third person, either corporate or individual, to whom it has already been granted by the state.'

"Vice Chancellor Stevens, in Wilson, Atty. Gen., v. East Jersey Water Co., 78 N. J. Eq. 329, 332, 79 A. 440, 441, said:

"In the Hudson County Case [70 N. J. Eq. 525, 61 A. 710] it was declared by the Supreme Court of the United States that the state has the constitutional power to insist that its natural advantages shall remain unimpaired by its citizens, and that it is not dependent upon any reason for its will so to do. Mr. Justice Holmes says: "It appears to us that few public interests are more obvious, undisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it, substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit, for the purpose of turning them to a more perfect use." In that case, in the exercise of its police power, the Legislature had passed an act making it unlawful to transport into any other state, by pipes or conduits, the waters of brooks, streams, or ponds, and the act was held to be valid. There is no statute restraining the transportation or distribution of water within the state, except the act of 1907 (P. L. 1907, p. 633), section 2 of which, however, provides that nothing therein contained shall be construed to take from any municipality the right to use and take all the water which it has the right to use or appropriate by purchase or condemnation.

" 'The Attorney General does not contend that the state has, by express legislation, forbidden the East Jersey Water Company to supply municipalities with water. He rests his case upon the company's lack of power, his position being that, having been incorporated under the General Corporation Act, it is not by that act authorized to engage in the business of selling water. It is not pretended that the company has, under its charter, any more right to take water than any other riparian owner has. What that right is, is thus stated by Mr. Justice Pitney in the Hudson County Water Company's Case. He says: "In a sense the landowner owns the water while it is upon the land, but his ownership is limited to a usufructuary interest, without right to divert any from its natural course, saving for the limited uses that naturally and of necessity pertain to a riparian owner, such as the supply of his domestic needs, the watering of his cattle, the irrigation of his fields, the supplying of power to his mill, and the like. This right of user is limited to so much as shall be reasonably necessary, and is qualified by the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality. The common law recognizes no right in the riparian owner as such to divert water from the stream in order to make merchandise of it, nor any right to transport any portion of the water from a stream to a distance for the use of others." '

"See, also, McCarter v. Hudson County Water Co., 70 N. J. Eq. 525, 61 A. 710; Id., 70 N. J. Eq. 711, 65 A. 489, 14 L. R. A. (N. S.) 197, 118 Am. St. Rep. 754, 10 Ann. Cas. 116; Id., 209 U. S. 355, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; Paterson v. East Jersey Water Co., 74 N. J. Eq. 49, 70 A. 472, affirmed, 77 N. J. Eq. 588, 78 A. 1134.

"Two acts of the Legislature have been passed to conserve the water resources of the state for the beneficial use of the people. See Comp. Stat. p. 5797, in 1910. Control of the subsurface waters has been taken by statute. See Comp. Stat. p. 5801. See, also Collingswood v. Water Supply Commission, 84 N. J. Law, 104, at page 110, 86 A. 660; Trenton v. New Jersey, 262 U. S. 182, 43 S. Ct. 534, 67 L. Ed. 937, 29 A. L. R. 1471. Furthermore, as to underground waters, see Meeker v. East Orange, 77 N. J. Law, 623, 638, 74 A. 379, 385 (25 L. R. A. [N. S.] 465, 134 Am. St. Rep. 798), in which Chancellor Pitney said, regarding the doctrine of reasonable user: 'But it does prevent the withdrawal of underground waters for distribution, or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses.'

"These cases and statutes sustain these propositions: (1) That the plaintiff as a riparian owner, and as owner of land upon which water may be obtained from subterranean sources, has no right to sell or dispose of that water or use it elsewhere than in connection with its property and within limits. (2) That any right to transport this water for public uses must be therefore a right conferred by a franchise, and, if it is a franchise right, then it is to be excluded in fixing the rate base. See Georgia Ry. v. R. R. Comm., 262 U. S. 625, 632, 43 S.

Ct. 680, 682 (67 L. Ed. 1144), which holds: 'That such franchises are to be excluded in fixing the rate base was settled by Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 669 [32 S. Ct. 389, 56 L. Ed. 594], Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 169, 35 S. Ct. 811 [59 L. Ed. 1244], and Galveston Electric Co. v. Galveston, 258 U. S. 388 [42 S. Ct. 351, 66 L. Ed. 678]. The allowance for the franchise made in Willcox v. Consolidated Gas Co., 212 U. S. 19, 43, 44, 48 [29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034] was rested on special grounds which do not exist in this case,' and if the plaintiff has a franchise right to sell, transport, or dispose of water; still it holds whatever right it has subject to the right of the state of New Jersey, as sovereign, to control and administer these waters for the benefit of the people of New Jersey, and of this sovereign privileges New Jersey has not divested itself.

"In the great case in New Jersey, Public Service Co., v. Public Utility Board, 84 N. J. Law, 463, 87 A. 651, L. R. A. 1918A, 421, it was decided that franchises are not to be included in the rate base. In the Georgia Case, supra, 262 U. S. 632, 43 S. Ct. 680, 67 L. Ed. 1144, the facts appear in that case as follows: The street railway company had the right and privilege of laying tracks in the public streets of Atlanta, and evidence was offered showing the value of this right or privilege; but the decision of the Supreme Court was that such a right or privilege was not an element of value in fixing rates between the public and the utility company.

"It seems to me that the rights of the plaintiff and of the Georgia Railway Company are essentially similar; one to lay its tracks on the public streets, and the other privileged to sell the waters in which the state has the ultimate title. However, as this matter is one of great doubt, and as the meritorious question involved in this case can be decided without a definite determination of the plaintiff's claim in this particular, following the case in the Supreme Court of the United States, Denver v. Denver Union Water Co., 246 U. S. 178, 193, 38 S. Ct. 278, 283 (62 L. Ed. 649), wherein Mr. Justice Pitney said: 'The question is one of great consequence, and is not free from difficulty. It ought not to be passed upon unless the exigencies of the case require it'—this question will not be further passed upon.

"Insufficiency of Service.

"Considerable time in the hearing was consumed with the testimony from the consumers in the plaintiff's district of inadequacy of service, with details of it which abundantly sustained such a contention. The plaintiff admitted frankly that the service was inadequate, but claimed a lack of funds, due to insufficiency of income.

"The plaintiff presented to the defendant board a program for improvements of service which involved the installation of a 24-inch main from Oak Tree to Carteret, at an expenditure of $452,000, which was approved by the defendant, and also the installation of an air lift system at the Park Avenue station at a cost of $250,000, which was criticized by the board in its report. Notwithstanding, the plaintiff had its definite program for improvements. The defendant, in its order allowing rates, directed that they should be reduced 10 per cent. until the plaintiff afforded and provided better service.

"It is obvious that the plaintiff must render adequate service to the public, and that the defendant may order and compel such performance of duty and make an order to that effect; but the plaintiff must have a reasonable opportunity to comply with the order, and this was not given to the plaintiff by the board in its order. These views are abundantly sustained in the following cases: Olmsted v. Proprietors of the Morris Aqueduct, 47 N. J. Law, 311; Oklahoma Gas Co. v. Oklahoma, 258 U. S. 234, 42 S. Ct. 287, 66 L. Ed. 590; New York & Queens Gas Co. v. McCall, 245 U. S. 345, 38 S. Ct. 122, 62 L. Ed. 337.

"It appears that this inadequacy of service had been known to the defendant for a long time, and no action was taken by it. The public authorities and the consumers within the water district served by the plaintiff complained, but did not take legal action, either before the board or elsewhere, to secure relief. Under the circumstances, the plaintiff should have a reasonable time to put into effect its program, and in the meanwhile should not be deprived of its necessary revenue or income.

"Special Matter.

"The plaintiff claimed that the rates should be sufficient to afford a fair return on the fair value of its property in the public service, sufficient to produce a net income of twice the interest on the obligations of the plaintiff issued and about to be issued. The outstanding and new obligations would require an outlay for interest of $114,000, and twice that sum ($228,000) should be the net income of plaintiff before it would be in a position to float its new issue of bonds.

"Bankers testified that the investing public required from utility companies a net income of twice the amount of interest. Conceding all this, it is not perceived how this question at this juncture is pertinent. The question here is one of confiscation, and, when that question is determined, the duty of the court is fulfilled. This issue does not raise any question of law.

"The rates should be large enough to meet operating expenses, pay taxes, keep the property unimpaired, induce the investment of money in the business, and make a fair return on the value of the property. Seven and a quarter per cent. was fixed by the board as the rate which plaintiff was entitled to have, and there has been no testimony to the contrary. If the plaintiff receives a return on the fair value of its property based on that rate, the formula of a fair return has been fulfilled. Rate making is not a function of the courts.

## "Fair Value.

"Bluefield v. Pub. Serv. Comm., 262 U. S. 679, 689, 43 S. Ct. 675, 67 L. Ed. 1176, succinctly states the factors in arriving at fair value, and the errors into which the commission fell in reaching the result in that case. The defendant board committed the same errors. The court said (page 689 [43 S. Ct. 677]) : 'The record clearly shows that the commission, in arriving at its final figure did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, [262 U. S.] 276 [43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807]. Plaintiff in error is entitled, under the due process clause of the Fourteenth Amendment, to the independent judgment of the court as to both law and facts. Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289 [40 S. Ct. 527, 64 L. Ed. 908], and cases cited.' And at page 692 [43 S. Ct. 678]: 'It is clear that the court also failed to give proper consideration to the higher cost of construction in 1920 over that in 1915 and before the war, and failed to give weight to cost of reproduction less depreciation on the basis of 1920 prices, or to the testimony of the company's valuation engineer, based on present and past costs of construction, that the property in his opinion was worth $900,000. The final figure, $460,000, was arrived at substantially on the basis of actual cost, less depreciation, plus 10 per cent. for going value and $10,000 for working capital. This resulted in a valuation considerably and materially less than would have been reached by a fair and just consideration of all the facts. The valuation cannot be sustained.'

"In the schedule hereto annexed, I have set forth the estimates of Messrs. Hill and Shaw of the costs of duplication of this plant, its depreciation, overheads, and going value as determined by me. The final figures of the two experts, when the proper estimates of depreciation, overheads, and going value are considered, are close together.

"I am now to consider the evidence, elicited on the cross-examination of Hill, that the value of this plant was $2,500,000, with the reasons therefor. I quote the pertinent part of Mr. Hill's testimony: 'After making an estimate for depreciation of $375,000, or thereabouts, I find that the value, less depreciation, at current prices, is $2,878,000, and I have those two figures, $2,878,000 and $2,995,000. Then I realized there are certain deficiencies, certain things that will have to be done to this property, other factors, probably some duplication. Prices may be less, although you cannot say; there is no marked tendency that way. Now, I say, my value is $2,500,000; that is $715,000 less than it would cost me to reproduce an equivalent plant in all particulars, and with $715,000 added to the purchase price of $2,500,000 this plant would be a first-class bang-up, fine piece of property that nobody, I think, would find any fault with.'

"The plaintiff, in its petition to the defendant board for increased rates, over the signature of its President, submitted its estimate of value as follows: 'The fair value of the company's property as of December 31, 1922, is $2,500,000, not including the value of its sources of water supply and consolidation value and assembly value of real estate, which have not been appraised. * * *'

"These opinions of value are evidence. (See the quotation from Bluefield Case as to the valuation of the plant by the engineer. See, also, Freeman v. Ackerson, 94 N. J. Law, 308, 110 A. 701, as to admissions in pleadings.) Mr. Bergen is an expert on all questions pertaining to water plant, particularly this one, and equal to any expert in this case.

"The defendant did not produce any

expert to give his opinion on the value of the plant, although it elicited from Mr. Hill his admissions and opinions, which he expressed in the rate cases. I shall consider Mr. Hill's opinion on the value of this plant, together with the reasons he assigns for his opinion, and I think these are the reasons which he gives for his opinion. This plant has not for years been sufficient or adequate to serve the communities. There are duplications, deficiencies, and the prices on the theory of reproduction new give the highest results, and the investment or book value is less than the cost of reproduction new. The rates ought not to be too high, for high water rates do not always produce increased revenue, and the operating expenses of this plant are high. Under all the circumstances, $2,-500,000 is the value of this plant.

"The public are to pay for an efficiently functioning plant, and if there are duplications, or other not over-useful parts of the plant, the valuation of the plant would be less than the sum of the prices of the component parts of the plant. These duplications fully justify Mr. Hill in his opinion of value as being less than the cost of the reproduction of this plant at present day prices.

"If this plant is worth less than $2,500,-000, the defendant board, with its staff of assistants and its expert, could have presented testimony of what its experts believed the value of this plant was. The burden of proof is on the plaintiff to produce convincing evidence of the value of this plant, and by the evidence, and not by any guesswork, must the judgment of value be predicated. Taking the evidence in all its aspects, my judgment is that, on the proofs, this plant is worth $2,500,000.

"Fair Return.

"The rules as to what constitutes a fair return have been stated so frequently as to render superfluous any restatement. The board fixed the rate at 7½ per cent., and that has been accepted as a fair percentage which the plaintiff should receive upon the value of this property in the public service.

"The question as to the insufficiency of service has been disposed of in this report, and it is now only necessary to observe that the powers of the defendant board are adequate to compel the plaintiff to render efficient service, and, upon its failure to do so, to reduce the rates while such insufficiency lasts. Of course, the plaintiff should have

10 F.(2d)—34

reasonable time within which to rehabilitate its plant, or make such improvements as are necessary.

"The board thought that the schedule of rates ought to yield a gross revenue of $360,-000, and that the operating expenses, taxes, depreciation, etc., would amount to $180,000. For nine months in 1924, the new schedule of rates was in operation, and the result was that for 1924 the gross revenue received by the plaintiff was $282,539.53, and the gross revenue deductions for that year amounted to $208,148.90. For the year 1923, the gross income of the company was $280,680.63, with gross revenue deductions for that year or $184,163.67. For the wear 1924, $78,390.-63 was the net income of the company.

"Revenues for the years 1923 and 1924 (see D—1 Exhibit, January 6, 1925):

|  | 1923. | 1924. |
|---|---|---|
| Revenues | $280,680.63 | $282,539.53 |
| Revenue and operating deductions | 184,163.67 | 208,148.90 |
| Net revenue | $ 96,516.96 | $ 74,390.63 |

"The fair return requires a net revenue of at least $181,000. The present rates are clearly confiscatory. I have not attempted to estimate the amount that will be needed for the additional operating expenses when the improvements are made. The defendant board's duty to provide sufficient income to meet the expenses (in the rates allowed) will without doubt be fully performed.

"The board, proceeding along one line of inquiry, has reached a resolution different from that reached by me. The function of this court is to determine on legal evidence the one question submitted to it, as to whether or not the constitutional rights of the plaintiff have been violated by the order made by the defendant board.

"After thorough inquiry and consideration, the result reached is that the rates are of the character alleged by the plaintiff, and it is therefore recommended that a decree be entered, adjudging that the valuations of the plaintiff's properties made by the defendant board of public utility commissioners and mentioned in the pleadings in this cause are far below their true value for rate-making purposes, and that the schedule of rates be annulled as confiscatory, and in violation of the Fourteenth Amendment of the Constitution of the United States, and otherwise illegal. And it is further recommended that the jurisdiction of the cause be retained, to

the end that either party may apply for such further and other relief as may be necessary."

### Schedule No. 1.

Cost of Reproduction New and Depreciation of Plaintiff's Plant, Useful and Used as of September 31, 1924.

| Item (1) | Cost of Reproduction. New (2). | Depreciated (3). |
|---|---|---|
| Tangible property (used and useful) in place December 31, 1923: | | |
| Schedule | | |
| 105 Water diversion rights.. | $ 31,300 00 | $ 31,300 00 |
| 106 Reservations ............ | 6,200 00 | 6,200 00 |
| 107 Impounding dams and reservoirs ............ | 245,100 00 | 194,850 00 |
| 109 Springs and wells........ | 105,550 00 | 89,574 00 |
| 112 Gravity intakes and suction mains ............ | 24,751 00 | 23,342 00 |
| 115 Coagulating basins ..... | 150 00 | 112 00 |
| 117 Filters ................... | 76,017 00 | 54,961 00 |
| 119 Chemical treatment plant ................... | 1,200 00 | 720 00 |
| 121 Pumping stations ....... | 73,126 00 | 70,724 00 |
| 122 Steam power equipment | 220,393 00 | 155,262 00 |
| 125 Gas power pumping equipment ............. | 6,913 00 | 5,224 00 |
| 126 Miscellaneous pumping equipment ............. | 500 00 | 325 00 |
| 128 Storage reservoirs, tanks, and standpipes | 57,189 00 | 49,951 00 |
| 129 Distributing mains and accessories ........... | 1,321,896 00 | 1,254,567 00 |
| 130 Service pipes and stops | 86,878 00 | 74,153 00 |
| 131 Meters, meter boxes, and vaults ............ | 98,109 00 | 79,804 00 |
| 132 Fire hydrants and fire cisterns ............... | 51,155 00 | 46,002 00 |
| 134 General structures....... | 9,367 00 | 8,773 00 |
| 135 General equipment ..... | 17,500 00 | 11,375 00 |
| Total base cost of physical property as of December 31, 1923 .................... | $2,433,294 00 | $2,156,219 00 |
| Deduct accrued depreciation on above property from January 1, 1924, to September 30, 1924, inclusive, at the rate of 1.25 per cent. per annum on the cost of reproduction new of depreciable property... | | 21,264 00 |
| | $2,433,294 00 | $2,134,955 00 |
| Base cost of reproduction of net additions to property from January 1, 1924 to September 30, 1924, inclusive ...................... | 60,619 00 | 60,335 00 |
| | $2,493,913 00 | $2,195,290 00 |
| Deduct base cost of deferred maintenance as of September 30, 1924............. | | 5,850 00 |
| Total base cost of physical property as of September 30, 1924. .................... | $2,493,913 00 | $2,189,440 00 |
| Allowance for overheads, 15 per cent.... | | $ 319,710 40 |
| Going value ............................ | | 169,951 00 |
| Organization ............................ | | 37,500 00 |
| Working capital ........................ | | 70,000 00 |
| Total cost of reproduction new, less depreciation ......................... | | $2,786,601 40 |

Note: Overheads .......... $308,324 00
Overheads on land.. 11,386 00

Total overheads.. $319,710 00

### Schedule B.

Property at Original Cost.

| | Cost New. | Depreciated Cost. |
|---|---|---|
| Property in place December 31, 1915, at prices of 1914 and 1915 ......:......... | $ 825,632 00 | $ 522,939 00 |
| Property placed since December 31, 1915, at original cost ...................... | 535,532 00 | 487,005 00 |
| Working capital ........... | 55,000 00 | 55,000 00 |
| Total .................... | $1,416,164 00 | $1,064,944 00 |

Property at Prices of September, 1924.

| | Cost New. | Depreciated Cost. |
|---|---|---|
| Property in place December 31, 1915, at prices of September, 1924 .............. | $1,839,573 00 | $1,189,334 00 |
| Property placed since December 31, 1915, at prices of September, 1924........ | 626,898 00 | 567,431 00 |
| Working capital ........... | 55,000 00 | 55,000 00 |
| Total .................... | $2,521,461 00 | $1,811,765 00 |

Shaw's Estimate, with Overheads and Going Value as Found by the Master.

| | |
|---|---|
| Total value of property at prices of September, 1924, less overheads and working capital ............................... | $2,247,329 00 |
| Depreciation ..:........................... | 304,473 00 |
| | $1,932,856 00 |
| Overheads, 15 per cent..................... | $ 291,428 00 |
| Land value ............................... | 133,954 00 |
| Overheads, 8½ per cent. on land......... | 11,386 00 |
| Going value ............................. | 169,951 00 |
| Organization ............................. | 37,500 00 |
| Working capital ......................... | 70,000 00 |
| | $2,647,175 00 |

Frank Bergen, of Newark, N. J., for complainant.

Thomas Brown, of Perth Amboy, N. J. (Frank H. Sommer, of Newark, N. J., of counsel), for defendant.

Before DAVIS, Circuit Judge, and RELLSTAB and CLARK, District Judges.

RELLSTAB, District Judge. This suit seeks to enjoin as invalid the defendant's rate order of July 24, 1924, made effective as of April 1st of that year. The case is before us (sitting under section 266 of the Judicial Code, as amended by Act Feb. 13, 1925 [1925 Supp. U. S. Compact Ed. pp. 69, 70]) on final hearing on exceptions to the master's report, filed by both parties. Those of the plaintiff are said to be but precautionary, and were not pressed at the hearing.

The plaintiff is a New Jersey corporation, and under state legislative authority owns and operates a waterworks and distributing system, supplying water for public and private use. The defendant is a commission of that state, possessing regulatory powers over the services rendered and rates charged

by the public utilities of the state. The sole question before us is whether the rates prescribed by the defendant are confiscatory. The master, in a very helpful discussion of the issues, reached the conclusion that they are and should be annulled. The crucial questions relate to valuation.

The defendant found that the plaintiff's service was not up to the required standard, and that the value of its property for rate-making purposes, as of December 31, 1923, including cost of a proposed 24-inch transmission main "needed to adequately supply the needs of the consumers," which it estimated would cost $454,020, was $2,190,200, and that a fair return to the company on such valuation, "subject to the provision that the service rendered by it shall be safe, adequate, and proper, is $160,000." The defendant's summary of the elements of the gross revenue required is as follows:

| | |
|---|---:|
| Return upon investment (with safe, adequate, and proper service)...... | $160,000 |
| Operating expenses ................. | 122,386 |
| Annual depreciation ................. | 22,500 |
| Taxes .......................... | 58,240 |
| Gross revenue required............. | $363,126 |
| Revenue collected in 1923........... | 280,680 |
| Indicated increase (29.3 per cent.).... | $ 82,446 |

To realize the required revenue, it increased the rates, but provided that a deduction of 10 per cent. be made on "all bills to be rendered, except to associated companies and for miscellaneous water service, * * * until such time as the company shall have given satisfactory evidence that it is rendering safe, adequate, and proper service to both public and private consumers."

There is substantial agreement between the parties as to the kind and quantity of the plaintiff's properties used and useful in carrying on its business. Indeed, the experts of the defendant accepted as accurate the inventory furnished by the plaintiff, and made it the basis of their testimony. As stated by the defendant in its rate decision, made a part of the answer herein, "both appraisers (Nicholas J. Hill, Jr., plaintiff's main expert on valuation, and Water A. Shaw, principally relied upon by defendant) used the same inventory of the physical property, and as far as pricing this inventory is concerned and before adding overheads the two appraisers are in close agreement."

The defendant, in dealing with the value of plaintiff's property, said:

"The basic test of the reasonableness of rates is the fair value of the property used and useful in the service of the public. The determination of that value is a matter of reasonable judgment, based on all relevant facts. It is not controlled by artificial rules or formulas. In this determination the original cost of the property, the expenditures for permanent additions and improvements made since the original construction, the present and probable future cost as compared with the original cost to reproduce the property, accrued depreciation, including deferred maintenance of the property and proper allowance for overheads, working capital, and intangibles are all elements to be considered. Neither the present nor the original cost to reproduce the property, nor the amount of securities outstanding against it, can be considered as the controlling element in determining its fair present value for establishing rates."

What consideration was given to these several elements, and how and to what extent each was applied in determining the value of the plaintiff's property, does not appear in the defendant's report. It contrasted the different views and estimates of the experts, particularly those of Hill and Shaw, but gave little indication of the reasons controlling its decision. Shaw gave no opinion as to the value of the plaintiff's property. Hill valued it at $2,500,000. This was the valuation found by the master. Hill and Shaw disagreed as to the weight to be given certain of the elements concededly to be considered in ascertaining values, and radically differed in the method of ascertaining accrued depreciation.

In the proceedings before the defendant, the valuations were made as of December 31, 1923, while those in the present proceedings were brought down to September 30, 1924. The items of properties inventoried as of the earlier date are the same in both proceedings. The inventory in the present proceedings includes additions made since December 31, 1923, and embraces the changes in prices since that date. Hill fixed the amount of the additions at $60,619, and Shaw acceded thereto.

Hill had an inventory of the properties in place made. He ascertained the quantities thereof by field inspection and measurements, and by using the plaintiff's records relating to the construction of its plant. He then personally inspected the properties. Before the defendant he appraised them as of December 31, 1923, and in the proceedings before us he used the prices current at about September 30, 1924. He divided the prop-

erties into tangibles and intangibles, and appraised them undepreciated and depreciated.

As to the properties undepreciated:

| | |
|---|---|
| The tangibles in place on December 31, 1923 he appraised at........ | $2,433,294 |
| And the additions from that date to September 30, 1924, at......... | 60,619 |
| Total at latter date............... | $2,493,913 |
| To this he added for overheads, 17½ per cent. ......:........... | 436,435 |
| Total gross cost of physical property at latter date.............. | $2,930,348 |
| He then added for working capital | 70,000 |
| Total of tangible property as of September 30, 1924................ | $3,000,348 |

Under the head of intangibles he added:

| | | |
|---|---|---|
| For organization cost.... | $ 37,500 | |
| For going value, 10 per cent. of the total gross cost of the physical properties .:.......... | 293,000 | |
| Total of intangibles ............:..... | | 330,500 |
| Making the grand total of all properties undepreciated ........... | | $3,330,848 |

Shaw's inspection of the properties was very limited, extending not over two days. He adopted the inventory made by Hill as to quantities, after spot-checking and satisfying himself that it was accurate. He also appraised the properties undepreciated and then as depreciated.

As to undepreciated: He made two appraisals, embodying two different classes of prices. In the one he applied "unit prices representing the cost of labor and material during the year 1914 and 1915" as to the properties in place December 31, 1915, and as to that subsequently acquired he took the cost to the company. In the other appraisement he applied "trend prices" as of September 30, 1924, and then added property acquired thereafter at the original cost.

| | |
|---|---|
| In his first, he appraised the properties in place, December 31, 1915, at | $ 825,632 |
| And the property acquired thereafter to September 30, 1924, at...... | 535,532 |
| To this he added working capital... | 55,000 |
| . Total ......:............... | $1,416,164 |
| In his second, he appraised the property in place December 31, 1915 at | $1,839,573 |
| And that acquired between that date and September 30, 1924, at....... | 626,898 |
| He then added for working capital.. | 55,000 |
| Total ..................... | $2,521,471 |

None of these appraisals included anything for the company's source of water supply. Hill's appraisal, both before the defendant and in this suit, included the value of the land exclusive of the water supply. Shaw did not include land values in his appraisals in these proceedings or in those before the defendant. Adding to Shaw's appraisal, based on "trend prices," the value of the lands as appraised by others, and which the defendant accepted, viz. $133,854, the total value of the properties as of September 30, 1924, undepreciated, on the basis of this appraisal of Shaw, would be $2,655,325. Hill added 17½ per cent. for overheads as a separate item. Shaw made no separate item for overheads, but said that he included them in his appraisal of the properties in place, by adding 13 per cent. to the unit cost referred to. Nor did he add cost of organization as a separate item, for which Hill added $37,500.

An examination of Shaw's detailed "overhead table" does not disclose organization cost as an item, and a comparison of Hill's and Shaw's "overhead tables" shows that they embrace the same character of items. Shaw made no specific allowance for going value, explaining that, in making his appraisal, he treated the plaintiff's property as a going concern with a connected business, and that if it had been otherwise the properties would have had only junk value. Hill made a separate allowance of $293,000 for going value, being 10 per cent. of the appraised value of the tangible property as of September 30, 1924, including the overheads. He distinguished going value from development cost, saying that the former represented the cost of attaching the business to the properties after the physical structures were completed, and "that in every utility, after the physical structure is completed, there ensues a period during which it is necessary to develop the business and income of the property, or to attach the business to the property; * * * that a property with an established business and income is worth more than the bare bones of the plant."

It will be noted that, in both of Shaw's appraisals, he took December 31, 1915, as the date for his first appraisement. This was the method employed by him in testifying before the defendant, at which time he appraised the property in place on that date at $824,632, using the pre-war prices for that purpose. This amount is but $100 less than he testified to in the present proceedings, and may be a typographical error.[1]

The defendant's valuation of structures as of the same date was $1,070,762, an in-

crease of $246,130 over Shaw's. No explanation is given as to how the defendant arrived at this figure, but when it is compared with the appraisal that Shaw made before it on the basis of "reproduction new—1923 prices," viz. $1,852,850, it is apparent that the defendant gave little weight to the cost of reproduction new test in ascertaining values.

The defendant in its decision gave separate values for land and rights of way, overheads, cost of organization, and going value, following Hill's rather than Shaw's methods in those particulars. As to lands, etc., the defendant accepted Hill's valuation of $133,-854, but allowed only $125,154 thereof, on the ground that certain lands and equipment included in the Hill appraisal were not "devoted to the service of the customers and municipalities served directly by the Middlesex Water Company."

As to overheads, the defendant allowed 15 per cent. on structures existing December 31, 1915, which amounted to $160,614. As to the cost of organization and going concern value, the defendant adopted Hill's percentages; but, as it applied them only to the structural cost, the amount allowed by it was about $12,000 less for organization cost and about $23,000 less for going value than allowed by Hill. The defendant's allowance for working capital was $62,500, which is $7,500 less than Hill's.

There is nothing in the defendant's report that indicates how these particular amounts were reached, but it is noted that, as to overheads and working capital, the only two of those items for which a comparison is available, the amounts allowed by the defendant are about midway between those allowed by Hill and Shaw. This may be only a coincidence, but it suggests "splitting the difference."

The defendant's valuation of the plaintiff's property as of December 31, 1923, undepreciated, was $2,113,909; that of Hill before the defendant, at current prices of about the same date, $3,215,065; that of Shaw before the defendant, at 1923 prices, by adding thereto land values, $2,611,817. This comparison also shows that the defendant gave little heed to the reproduction cost new method in ascertaining values. If to Shaw's appraisal is added the defendant's allowance of cost of organization, $25,492, and going concern value, $169,951, making a total appraisal value of $2,807,260, the failure of the defendant to follow the reproduction cost new test is emphasized.

[1] The World War conditions radically increased the cost of labor and commodities of all sorts. Previous thereto the level of prices was practically stable. While the peak in high prices has passed, and there is reason to believe that it will not permanently return, yet the prevailing prices continue to be considerably higher than they were in 1915. Fluctuations there are, but the general level in prices persists in continuing much higher than they were prior to the war, and clearly negative that they are but fleeting, or due to temporary conditions. While these higher levels continue, they must be given effect in fixing the rate base, as it is not the past (historical), or the future (speculative), but the present, fair value that must be ascertained.

[2] The defendant, in our judgment, leaned too heavily toward the pre-war prices in its fixing of the rate base, and in so doing it erred. The master was much impressed by Hill's valuations and his methods in arriving at them. In the main, we likewise are so impressed. His fixing the value of the plaintiff's property in question, undepreciated, at $3,330,848, is well supported by the testimony, and we find it as one of the facts in the case.

As to the properties depreciated: In the present proceedings, as well as those before the defendant, Hill ascertained depreciation by adopting the sinking fund method, using an interest rate of 3 per cent., while Shaw used the straight-line theory, which excludes the effect of interest accumulated on the periodic contribution to the depreciation fund. Before the defendant, Hill fixed the depreciation on values, based on prices current December 31, 1923, at $336,660, giving the properties a depreciated value of $2,-878,405. Shaw's estimate of depreciation before the defendant, as of the same date, as applied to his appraisal at 1923 prices, was $677,517, and he figured the property thus appraised, depreciated, at $1,800,446.

The defendant approved Shaw's method in determining depreciation, which, as it stated in its report, "results in approximately twice the amount of accrued depreciation obtained by Mr. Hill," and ordered "that 25 per cent. should be deducted from the value new of structures and equipment for accrued depreciation." The depreciation thus figured amounted to $424,878. As fixed by the defendant, the value of the property so depreciated was $1,689,031. This the defendant did, notwithstanding that it found that the plaintiff's mains constituted about

one-half of the value of its tangible property, and that sections of the mains submitted to it "showed that after years of use the mains from which they were cut showed little or no deterioration whatever."

In the present proceedings, Hill estimated the depreciation as of September 30, 1924, at $357,756, and appraised the property depreciated at $2,973,092; Shaw estimated the depreciation as of the same date (as applied to his appraisal, wherein he took the "trend prices" of that time) at $709,696, and appraised the property depreciated at $1,811,765. It will be noted that Hill's and the defendant's charges for depreciation are not far apart.

[3] The plaintiff attacks as arbitrary both the straight-line and sinking-fund methods in ascertaining depreciation, and contends that the actual observed depreciation test is the only just method of determining depreciation of properties situated and used as are those of the plaintiff. We do not deem it necessary to determine this phase of the controversy, for, if we ignore Hill's method of ascertaining depreciation and accept that of Shaw, which results in the largest amount of depreciation, the net value of the plaintiff's properties depreciated still exceeds $2,500,000, the value stated by the plaintiff in its schedule of increased rates filed with the defendant, and found by both Hill and the master.

[4] After giving full consideration to all the testimony bearing on valuations, we have reached the conviction that the fair value of the plaintiff's properties, useful and used in its business in securing and supplying water on December 31, 1923, and September 30, 1924, the respective dates to which the testimony of value related, is not less than the sum of $2,500,000, and we determine the value of such property for the said purpose at that amount. We reach this result without making any allowance for the sources from which the plaintiff obtains its waters.

[5] The rates fixed by the defendant, even if permitted to be collected in full, were estimated by it as a fair return on a valuation considerably less than $2,500,000. With the 10 per cent. deducted from the rates, as ordered by the defendant, the return on the valuation of $2,500,000 would be less than 6 per cent., which, in these days of inflated prices, or, in other words, diminished purchasing power of the dollar, in our judgment, makes the rates permitted to be collected confiscatory.

[6] In thus considering the 10 per cent. deduction ordered by the defendant, we are not unmindful that proper and adequate service requires the laying of a larger transmission main, and that in some circumstances the withholding of a portion of an authorized rate might be amply justified. However, on the record before us, there is nothing to justify the conclusion that the plaintiff is culpable for not having laid such a main. Before it can be so held, it must be afforded an opportunity through reasonable rates to earn, not only enough to produce a fair return on the value of its property, useful and used in the public service, but enough more to enable it to secure the capital necessary to install the required main and other facilities adequately to care for the increasing demands of a constantly growing population. This the rates allowed, even though not subject to the discount referred to, would not do; a fortiori, it could not be accomplished by still further reducing the returns, through subjecting the rates to the 10 per cent. deduction ordered.

For these reasons, we are of the opinion that the rates under consideration are confiscatory and invalid, and should be enjoined. The exceptions to the master's report are overruled, and his report is confirmed. Let a decree be prepared in accordance herewith.